WILSON, Circuit Judge,
dissenting:
The Majority has vacated its original opinion and replaced it with one that, unlike the original opinion, subjects Florida’s Firearm Owners’ Privacy Act (Act) to First Amendment scrutiny. While this is an encouraging development, the Majority believes the Act survives intermediate scrutiny. It does not. For this reason, I continue to dissent.
I.
Numerous medical organizations, including the American Medical Association (AMA), view firearm related deaths and injuries as a serious public health problem with particularly pernicious effects on children. These organizations believe that this public health problem can be alleviated by providing people, particularly children and their parents, with information about firearm safety.[1] Accordingly, the AMA has, among other things, adopted a policy encouraging “members to inquire as to the presence of household firearms as a part, of childproofing the home.” Prevention of Firearm Accidents in Children, AMA Policy H-145.990. From the AMA’s perspective, this inquiry could not be more vital, as the policies are specifically designed to “reduce pediatric firearm morbidity and mortality.” Id.
Consistent with their beliefs about how best to address this public health problem, a number of Florida doctors, including plaintiffs, followed the AMA’s advice. They routinely spoke with patients about firearms, asking patients if firearms were present in the home in order to specifically tailor follow-up safety information. There is no doubt that many doctors genuinely believe that these conversations can help protect their patients and the public. Indeed, some doctors believed these conversations to be so important that they were willing to lose the business of patients who refused to engage.
*902 In response to complaints by patients who found doctors’ questioning and counseling on the subject of firearms to be irritating, offensive, and overly political, Florida passed-the Act. Simply put, the Act is a gag order that prevents doctors from even asking the first question in a conversation about firearms. The Act prohibits or significantly chills doctors from expressing their views and providing information to patients about one topic and one topic only, firearms.
Regardless of whether we agree with the message conveyed by doctors to patients about firearms, I think it is perfectly clear that doctors have a First Amendment right to convey that message. This Act significantly infringes upon that right, and it is therefore subject, at the very least, to intermediate scrutiny. Subject to this level of scrutiny, the Act cannot pass constitutional muster.
The State’s asserted interests in protecting the rights of firearm owners, including their privacy rights, their rights to be free from harassment and discrimination, and their ability to access medical care, are incredibly important. Were the Act necessary to protect those rights, I believe the Act might survive an intermediate scrutiny challenge. But the State has offered no evidence to show that those rights are under .threat, nor is there evidence in the record suggesting that the Act will either directly or materially advance those interests.
Further, those interests must be weighed against doctors’ rights to convey their chosen message about firearm safety and to play their chosen role in addressing what they view to be a public health crisis. If there is disagreement in the medical community with the plaintiffs’ view that providing patients with information about firearm safety is good for public health, it is certainly not presented in the record before us.[2] Indeed, the record and common sense lead inexorably to the conclusion that children will suffer fewer firearm related injuries if they — and their parents — -know more about firearm safety. But now they will know less. As a result of the Act, there is no doubt that many doctors in Florida will significantly curtail, if not altogether cease, discussions with patients about firearms and firearm safety.
Thus, while the Act does not advance the State’s asserted interests, the Act does significantly limit doctors’ ability to speak to their patients in ways that they believe will protect the public and save lives. The poor fit between what the Act actually does and the interests it purportedly serves belies Florida’s true purpose in passing this Act: silencing doctors’ disfavored message about firearm safety. This, the State cannot do.
*903 The district court properly invalidated the Act as a content-, speaker-, and viewpoint-based restriction that “chills practitioners’ speech in a way that impairs the provision of medical care and may ultimately harm the patient.” Wollschlaeger v. Farmer, 880 F.Supp.2d 1251, 1267 (S.D.Fla.2012). The Majority reverses and holds that the Act survives intermediate scrutiny under the First Amendment. Supreme Court and Eleventh Circuit precedent, however, supports the conclusion that the Act cannot survive intermediate scrutiny.
II.
The Act contains four provisions at issue in this appeal. (1) The “record keeping provision” states that doctors cannot record firearm-related information in medical files that they “know” not to be “relevant.” Fla. Stat. § 790.338(1), (2) The “inquiry provision” states that doctors “shall respect a patient’s right to privacy and should refrain” from asking patients about firearm ownership, unless the doctor believes in good faith that the information is medically relevant. Fla. Stat. § 790.338(2), (3) The “discrimination provision” states that practitioners “may not discriminate” against patients on the basis of firearm ownership. Fla. Stat. § 790.338(5), (4) Finally, the “harassment provision” states that practitioners “shall respect a patient’s legal right to own or possess a firearm and should refrain from unnecessarily harassing” patients about firearm ownership. Fla. Stat. § 790.338(6).
This Act was passed in response to constituent complaints about the manner and extent to which doctors were discussing firearm ownership with patients. Specifically, as the State explains:
[Ajctual discrimination experienced by gun owners in Florida directly motivated the Legislature to pass the Act. Among other things, the Legislature heard that: a woman was given 30 days to find a new physician after she refused to answer questions about firearms in her home; a patient was asked by a physician to remove firearms from his home; a facility separated a mother from her children while interrogating them about firearms; a physician refused to care for a nine-year-old boy because he wanted to know about firearms in the home; citizens were falsely told that Medicaid required them to disclose their firearm ownership and would not pay if they refused to answer; a doctor refused to examine a child when the mother refused to answer firearms questions; and a facility billed for services not delivered after a family refused to answer questions about their firearms.
These experiences show that the Legislature’s action in passing the Act overwhelmingly was based on real concerns about protecting constituent privacy and preventing discrimination and harassment during doctor’s visits.
A Florida legislator’s own experience was similar: “After answering a pediatrician’s question about gun ownership, the pediatrician asked that [the legislator] remove the gun from his home. To the legislator, the doctor’s conduct constituted ‘a political ... attack on the constitutional right to own a ... firearm.’ ” A National Rifle Association representative also complained that questioning patients about gun ownership “to satisfy a political agenda needs to stop.” The State asserts that these are examples of what the Act was designed to stop.
Tellingly, the State attempts on appeal to narrow the scope of the Act — though it does so inconsistently. In any event, the Supreme Court has explained that a law restricting speech may be rendered uncon *904 stitutional based on “the inevitable effect of [the] statute on its face ... [or its] stated purposes.” Sorrell v. IMS Health Inc., — U.S. -, 131 S.Ct. 2658, 2663, 180 L.Ed.2d 544 (2011) (internal quotation marks omitted). Therefore, in assessing the constitutionality of the Act, we cannot ignore that this Act will inevitably silence doctors on the topic of firearms in all but the rarest of circumstances. Doctors risk losing their licenses if they are found to have violated the Act, so they cannot safely assume that the State will only advance the narrow reading of the Act it suggests here.
In a revealing portion of its brief, the State asserts that the “Act proscribes only inquiries within the doctor-patient relationship and recordkeeping about firearms that is not relevant to medical and safety concerns.”[3] At this point, difficulties arise because Appellees and -the State have different definitions of “relevant.” Many doctors and medical organizations assert that it is always relevant to ask about— and thus, to record — firearm-ownership information. As discussed, the AMA, as well as the American Academy of Pedia-tries, its Florida chapter, the American Academy of Family Physicians, its Florida chapter, the American College of Physicians, and its Florida chapter all recommend providing counseling and guidance on a variety of injury-prevention topics including firearm safety. Doctors thus quite legitimately insist that asking firearm-related questions as a matter of course and recording the information in medical files is good for their patients’ health and for the public’s safety.
As the incidents discussed in the legislative history suggest, however, the Act was apparently designed to prohibit doctors from routinely asking about firearm ownership on prescreening, informational forms. Appellees rightly suspect, despite the State’s present assurance to the contrary, that the standard of relevance contemplated by the Act is higher than the Appellees’ own standard. Consequently, for purposes of assessing the Act’s constitutionality, I assume that many doctors, absent some particularized fact or circumstance indicating that firearm ownership is particularly relevant,[4] will stop asking about and recording this information.[5]
*905 The Act also prohibits “discrimination” on the basis of gun ownership. One might reasonably expect, based on the incidents that prompted passage of the Act, that this provision bars doctors from declining to treat a patient who refuses to answer questions regarding firearm ownership. The Act explicitly affords doctors the continued right to refuse to treat such patients, however, see Fla. Stat. § 790.338(4), so the Legislature apparently intended to prevent other forms of discrimination when it passed the Act. The State asserts that “actual discrimination experienced by gun owners in Florida directly motivated the Legislature to pass the Act.” This statement is followed by the list of incidents contained in the legislative history. As noted above, the State also explained that the Act was passed in response to questioning about gun ownership and follow-up recommendations to make such ownership safer, including recommendations to remove guns from the home entirely. These discussions, which some constituents and legislators perceive to be a political attack, could be viewed as discriminatory. Based on their status as gun owners, some patients are subjected to uncomfortable conversations about firearms, while others are not. Because the State explicitly acknowledges that the legislative history provides examples of what constitutes discrimination, doctors reasonably fear punishment for discrimination under the Act for speaking as the doctors did in the above-cited incidents. Accordingly, the discrimination provision, like the record keeping and inquiry provisions, will cause doctors not to ask about or make recommendations regarding firearm ownership, particularly if patients are initially resistant to information on this topic.[6]
The harassment provision chills doctors’ speech even further. The State explains that “the Legislature enabled physicians to make [firearm ownership] inquiries of any or all patients, provided they do so with the belief that the inquiry is relevant to the patient’s care. Logically then, if a physician seeks firearms information to suit only a political agenda unrelated to the patient’s well-being, ... he may be unnecessarily harassing his patient....” As Appellees’ brief explains, consistent with AMA policy, many doctors believe that asking about firearm ownership is *906 related to the patient’s well-being in all cases, which is why questions about firearm ownership were asked by many doctors before the passage of this Act. As the legislative history makes clear, however, these routine inquiries and the follow-up conversations they prompted were deemed by constituents and legislators to be part of an anti-firearm political agenda which the State defines in its briefing as unnecessary harassment.
Most of the incidents discussed in the legislative history appear to involve nothing more than a disagreement between the doctor, who perceived the gun-related information to be relevant to the patient’s well-being, and the patient, who perceived the information to be part of an unwelcome political attack. The harassment provision of the Act suggests that the State has taken the patients’ side in this disagreement. There is nothing to suggest that the doctors’ inquiries or messages regarding firearms were not genuinely believed to be in the patients’ best medical interest when given. But there is evidence in the legislative history to suggest that the harassment provision is designed to prevent these conversations from taking place in the future. That is certainly the result it will achieve. Doctors will largely cease inquiring into and counselling on the topic of firearms, lest they be accused of crossing the line between providing life-saving preventive medical information and promoting an anti-firearm political agenda.[7]
Under this Act, then, one group of speakers, medical professionals, is prohibited or at least chilled from engaging in a great deal of speech about one topic, firearms. Doctors cannot' ask routine questions about firearm ownership of all incoming patients as they did before, despite the fact that a host of medical associations suggest that they should. Doctors cannot record information about their patients’ firearm ownership in highly-confidential medical files, even though the information may later prove essential to the doctor in a medical malpractice suit or to the patient in an emergency situation. Doctors also cannot provide firearm safety information and advice without running the risk of facing discipline if their medical efforts are construed to be part of a political agenda. Though the State offers reasons to believe that the Act might not be interpreted to prohibit all of these things, at various points in its briefing, the State accepts that these forms of speech are the intended targets of this Act. Under a reasonable interpretation of the Act, then, doctors are potentially subject to discipline for talking about firearms with their patients in all but a few narrow circumstances.
One final observation is in order regarding the Act’s interpretation. The State deemed the district court’s decision to *907 treat the inquiry and harassment provisions as mandatory rather than advisory as an intentional “effort to render the Act unconstitutional.” The Majority, however, accepts the district court’s interpretation that the inquiry and harassment provisions are mandatory. Thus, despite accepting an interpretation of the Act that even the State suggests would “render the Act unconstitutional,” the Majority strikingly holds that the Act survives First Amendment scrutiny. In other words, the Majority has gone further in limiting speech rights than the State argued it should or could.
III.
The Act proscribes speech about one topic (firearms) by one group of speakers (medical professionals). As such, the Act must be subjected to at least intermediate scrutiny, a standard it fails to satisfy. Accordingly, I conclude that the Act is unconstitutional.
A.
Recently, in Sorrell, the Court invalidated a “statute [that] disfavors marketing, that is, speech with a particular content. More than that, the statute disfavors specific speakers, namely pharmaceutical manufacturers.” 131 S.Ct. at 2663. Here, the Act directly prohibits firearm related inquiries and record keeping, as well as persistent discussions on the topic,[8] “that is, speech with a particular content. More than that, the statute disfavors specific speakers, namely,” doctors. See id. Thus, “[t]he law on its face burdens disfavored speech by disfavored speakers, [and] [i]t follows that heightened judicial scrutiny is warranted.” Id. at 2663-64. Indeed, “[t]he First Amendment requires heightened scrutiny whenever the government creates a regulation of speech because of disagreement with the message it conveys.” Id. at 2664 (emphasis added) (internal quotation marks omitted).
The speech restricted here is part of a tradition of exceptional protection, and it certainly is not within an area traditionally subject to “proscription.” The Court has explicitly recognized the importance of a free flow of information between doctor and patient, which this Act explicitly and directly limits. “[T]he physician must know all that a patient can articulate in order to identify and to treat disease; barriers to full disclosure would impair diagnosis and treatment.” Trammel v. United States, 445 U.S. 40, 51, 100 S.Ct. 906, 913, 63 L.Ed.2d 186 (1980). Relatedly, a “consumer’s concern for the free flow of ... speech ... has great relevance in the fields of medicine and public health, where information can save lives.” Sorrell, 131 S.Ct. at 2664 (internal quotation marks omitted).
And even if we assume that only speech which the State defines as medically irrelevant will be proscribed, Justice White’s concurrence in Lowe v. S.E.C. explains that while “the [S]tate may prohibit the pursuit of medicine as an occupation without its license, ... I do not think it could make it a crime publicly or privately to speak urging persons to follow or reject any school of medical thought.” 472 U.S. 181, 231, 105 S.Ct. 2557, 2584, 86 L.Ed.2d 130 (1985) (White, J., concurring) (emphasis added) (internal quotation marks omitted). Under the Act, doctors run the serious risk of being disciplined for harassing *908 patients by pushing a “political agenda” if they speak (too forcefully or persistently) to their patients about schools of medical thought which deem firearm ownership relevant.
There exists a second reason why the speech being silenced here deserves protection under the First Amendment. Greater protections are afforded to speech dealing with matters of public concern, which include “any matter of political, social, or other concern to the community.” Snyder v. Phelps, 562 U.S. 443, 131 S.Ct. 1207, 1216, 179 L.Ed.2d 172 (2011) (internal quotation marks omitted). Firearm safety qualifies as a public concern under that standard. So, too, does state regulation of health care. Under the Act, speech by Florida doctors to their patients regarding the former is almost entirely prohibited, and speech about the latter, as it relates to the Act itself, is significantly chilled lest a doctor’s complaint about the Act be perceived as harassing, anti-gun politicking. Further, under the Majority’s holding, speech about the latter could be eliminated entirely from the doctor-patient relationship.[9]
Further still, “the law’s express purpose and practical effect are to diminish the effectiveness” of firearm safety messages delivered by doctors. Sorrell, 131 S.Ct. at 2663 (explaining that “the inevitable effect of a statute on its face” and “a statute’s stated purposes” may be considered for purposes of evaluating constitutionality (internal quotation marks omitted)). Doctors asked patients about firearms in order to give specifically tailored — and thus more effective — firearm safety information. Indeed, amicus curiae supporting the State’s legislation explain that the Act is necessary because a “doctor’s questions can interfere with patients’ exercise of the right [to bear arms] by putting patients in a hesitant position where they question their ownership of firearms because of physician disapproval.” That statement is staggering. It suggests that the perceived problem with doctors’ truthful, non-misleading message regarding firearm safety was that .it was working, so the message was silenced. That is classic viewpoint discrimination.
Despite the State’s contention that pro-gun doctors are silenced on the topic just as surely as anti-gun doctors, the Act’s legislative history erases any doubt as to which viewpoint the State sought to silence. As discussed, the legislative history confirms that the purpose of the Act was *909 to silence firearm-safety messages that were perceived as “political attacks” and as part of a “political agenda” against firearm ownership. Moreover, the State’s argument that the Act is meant to protect the rights of firearm owners — in conjunction with the argument’s neglect of the rights of non-owners — further evidences which side the State is taking in this fight. Thus, “[i]n its practical operation, [Florida’s] law goes even beyond mere content discrimination, to actual viewpoint discrimination.” Id. (internal quotation marks omitted). “It follows that heightened judicial scrutiny is warranted.” Id. at 2664.
The Supreme Court has recognized that “[i]t is rare that a regulation restricting speech because of its content will ever be permissible.” United States v. Playboy Entm’t Grp., Inc., 529 U.S. 803, 818, 120 S.Ct. 1878, 1889, 146 L.Ed.2d 865 (2000). Content-based statutes, therefore, “are presumptively invalid.” R.A.V. v. City of St. Paul, 505 U.S. 377, 382, 112 S.Ct. 2538, 2542, 120 L.Ed.2d 305 (1992). Based on the foregoing, the only choice I believe we have to make is one between strict and intermediate First Amendment scrutiny. As Part IV below shows, the Act is unconstitutional under either standard so deciding between the two is unnecessary.
B.
The Majority is now persuaded that the' Act is subject to some level of scrutiny under the First Amendment. It is the analysis that follows where we part ways, as the Majority leaves open the possibility of a more deferential approach to restrictions of speech within the boundaries of a professional relationship.
1.
The Majority’s analysis creates a two-dimensional, four-category framework for assessing the scrutiny applicable to speech by professionals and assigns varying levels of scrutiny accordingly. To the extent that framework acknowledges that professionals speaking outside the confines of a professional relationship, on matters unrelated to the profession are entitled to the same First Amendment protection as nonprofessionals are, I agree with that conclusion. There is no reason to think that the State’s authority to regulate a profession extends to the entirety of a professional’s existence. In addition, the Majority’s conclusion that laws restricting speech by professionals furthering the profession outside a professional relationship, including commercial speech, must be subjected to First Amendment scrutiny is well-settled. See Gentile v. State Bar of Nev., 501 U.S. 1030, 111 S.Ct. 2720, 115 L.Ed.2d 888 (1991); Fla. Bar v. Went For It, Inc., 515 U.S. 618, 620, 623-24, 115 S.Ct. 2371, 2374, 2375-76, 132 L.Ed.2d 541 (1995).
The Majority then goes on to divide, within the context of a direct, professional relationship, speech furthering the practice of the profession from that irrelative to the profession; the Majority concludes that the Act regulates the. former category. According to the Majority, in this context, the governmental regulatory interest peaks, while the citizen’s interest in giving and receiving information reaches its nadir. Thus, while the Majority leaves the question open, it declares that this category of speech may actually be subject to a level of scrutiny more deferential than intermediate scrutiny.
This novel framework and the significance that the Majority attaches to it are problematic. It diminishes the First Amendment protection afforded to professionals by permitting the State to silence professionals on whatever topic the State sees fit. That is not what the Constitution commands. Our precedent instructs that intermediate scrutiny should apply, and we *910 relax this standard for restrictions on a professional’s speech only where certain characteristics so justify.
Justice White’s concurrence in Lowe, 472 U.S. at 228, 105 S.Ct. at 2582 (White, J., concurring), and Locke v. Shore, 634 F.3d 1185, 1191 (11th Cir.2011) stand for the proposition that a law regulating professional conduct that burdens speech may evade First Amendment scrutiny only when: (1) the law is a licensing scheme regulating entry into a profession; (2) the impact on speech (an impact felt only by unlicensed, would-be practitioners) is incidental to a broader State goal (ensuring the quality of the State’s professionals); (3) the burden on speech is content-neutral; and (4) the prohibition on unlicensed individuals’ speech does not extend beyond the confines of a one-on-one professional-client relationship. Only the fourth condition is present here. Thus these cases are readily distinguishable.
Some laws burdening speech evade First Amendment scrutiny where the burdens occur within a professional setting. See Locke, 634 F.3d at 1191 (“ ‘If the government enacts generally applicable licensing provisions limiting the class of persons who may practice the profession, it cannot be said to have enacted a limitation on freedom of speech ... subject to First Amendment scrutiny.’ ” (alteration in original) (emphasis added) (quoting Lowe, 472 U.S. at 232, 105 S.Ct. at 2584 (White, J., concurring))). Where this rule applies, the law is subject only to rational basis review. Lowe, 472 U.S. at 228, 105 S.Ct. at 2582 (requiring only that the regulation “have a rational connection with the applicant’s fitness or capacity to practice the profession” (internal quotation marks omitted)).
But this rule does not apply here, because, while there is one similarity between the regulations at issue in those cases and the Act here, there are several critical differences.
The similarity is that Lowe, Locke, and this case all consider speech that occurs within the confines of a one-on-one professional relationship. In Lowe, the defendant was accused of providing investment advice without a license, in violation of federal law. Id. at 227, 105 S.Ct. at 2582. Justice White considered the First Amendment implications of the fact that the investment “advice” was published broadly, suggesting that Lowe might not be engaged in the practice of investment advising at all. Id. Ultimately, Justice White concluded that the First Amendment protected Lowe’s right to convey this investment-related information for a profit, even if he had no license. Id. at 233, 105 S.Ct. at 2584-85. In discussing the First Amendment implications of licensing schemes generally, Justice White concluded that a professional who “takes the affairs of a client personally in hand and purports to exercise judgment on behalf of the client in the light of the client’s individual needs and circumstances is properly viewed as engaging in the practice of a profession.” Id. at 232, 105 S.Ct. at 2584. On the other hand,
[wjhere the personal nexus between professional and client does not exist, and a speaker does not purport to be exercising judgment on behalf of any particular individual with whose circumstances he is directly acquainted, government regulation ceases to function as legitimate regulation of professional practice with only incidental impact on speech; it becomes regulation of speaking or publishing as such, subject to the First Amendment! ]....
Id. Justice White concluded that because the defendant’s activities fell into the latter category, the First Amendment applied.
*911 Thus, Lowe established only that the existence of a professional relationship is a necessary condition if a law burdening speech is to evade First Amendment scrutiny. Nothing in Lowe implied that such a condition was sufficient to support this conclusion. In fact, Lowe suggests three more conditions, all of which have been present in subsequent cases applying Lowe’s rule, and none of which are present here.[10]
In addition to the above condition, Lowe also contemplated that speech would be burdened without First Amendment scrutiny only if the burden was a consequence of a professional licensing scheme. Id. at 229, 105 S.Ct. at 2583 (discussing “the principle that the government may restrict entry into professions and vocations through licensing schemes ” (emphasis added)). And there is a third condition, which recognizes that the government’s ability to burden speech through a licensing scheme without implicating the First Amendment “has never been extended to encompass the licensing of speech per se or of the press.” Id. at 229-30, 105 S.Ct. at 2583. This reasoning has developed into a rule that “any inhibition [must be] merely the incidental effect of observing an otherwise legitimate regulation.” Locke, 634 F.3d at' 1191 (emphasis added) (internal quotation marks omitted). In cases contemplating Lowe (and subsequently, Locke), the State’s regulation was not directed at speech but instead at improving the overall quality of a profession, broadly speaking, by ensuring that only qualified individuals practice the profession. See, e.g., id. (relying on Lowe to uphold a statute restricting the practice of interior design to licensed professionals); Accountant’s Soc’y of Va. v. Bowman, 860 F.2d 602, 604 (4th Cir.1988) (relying on Justice White’s reasoning in Lowe to uphold a statute restricting the use of certain terms in the work product of unlicensed accountants).
A fourth and final condition that is implicit in the rule contemplated in Lowe is content-neutrality — at least to a far greater extent than is present here. To be sure, the SEC’s prohibition applied only to the topic of investment advising, but within that field, it did not differentiate. It was not as if unlicensed advisers were left free to recommend investment products the government preferred — such as government bonds — but restricted from recommending anything else. Similarly, in Locke, unlicensed designers were not left free to recommend design techniques the government might prefer — such as energy saving, “green” designs — but restricted from recommending anything else. In this way, at least, the burden on speech in cases like Lowe is content-neutral.[11]
*912 Further, First Amendment scrutiny is not eliminated simply because burdened speech occurs in the course of conducting one’s business as a professional. Even in cases involving speech that is spoken only in pursuit of one’s profession, the Court has applied intermediate First Amendment scrutiny. See Sorrell, 131 S.Ct. at 2667-71 (applying intermediate First Amendment scrutiny to a law prohibiting pharmacies from selling records of doctors’ prescribing patterns to pharmaceutical salespeople); Went For It, 515 U.S. at 620, 623-24, 115 S.Ct. at 2374, 2375-76 (subjecting a regulation prohibiting lawyers from engaging in certain forms of direct advertising to intermediate First Amendment scrutiny); cf. Holder v. Humanitarian Law Project, 561 U.S. 1, 28, 130 S.Ct. 2705, 2724, 177 L.Ed.2d 355 (2010) (recognizing that when “conduct triggering coverage under the statute consists of communicating a message,” First Amendment scrutiny still applies).[12]
In Locke, all four conditions were satisfied. The challenged provision was a content-neutral professional licensing scheme applicable to interior designers that incidentally burdened the speech of unlicensed designers by prohibiting them from giving one-on-one design advice. 634 F.3d at 1191. The four conditions from Lowe were met, and First Amendment scrutiny was not applied. See also Lowe, 472 U.S. at 228, 105 S.Ct. at 2582 (White, J., concurring) (recognizing that First Amendment scrutiny does not apply to “[rjegulations on entry into a profession” (emphasis added)).
The Act is not a licensing scheme, rendering Locke and Lowe inapposite, and the differences do not stop there. The Act’s purpose is not to regulate the profession of medicine as a whole but rather to regulate one, narrow aspect of professional speech. Further, the Act does not incidentally burden speech as a consequence of the State’s pursuit of improving the overall quality of the profession as a whole. Instead, the Act directly targets speech per se by licensed professionals, not just speech incidental to the practice of a profession by the unlicensed.[13] The Act prohibits inqui *913 ries, record keeping, and unnecessarily harassing and discriminatory expression— which may consist of nothing more than recommendations to store firearms more safely or to remove them from homes with children if those recommendations are taken to be “political attacks” — on one topic, firearm ownership and safety. This of course renders the Act content-based rather than content-neutral, distinguishing this case even further from Locke.
Lowe’s rationale has wisely not been extended beyond these parameters. Lowe articulated reasons for limiting government intrusion into free expression. It recognized only that a very narrow category of speech — speech by unlicensed professionals engaging in the one-on-one practice of a profession for which they are unqualified — could be incidentally burdened as a consequence of licensing an entire profession. The holding of Lowe and the purpose of Justice White’s concurrence was to narrow that category, and thus to expand the free speech rights even of unlicensed professionals. By saying that unlicensed professionals’ free speech rights expanded, Lowe was not implying that licensed professionals’ free speech rights narrowed. The Supreme Court has explicitly warned against reading First Amendment case law in this way: “A rule designed to tolerate certain speech ought not blossom to become a rationale for a rule restricting it.” United States v. Alvarez, — U.S. -, 132 S.Ct. 2537, 2545, 183 L.Ed.2d 574 (2012) (plurality opinion).
Lowe’s rationale further supports the conclusion that licensed professionals enjoy First Amendment rights even when they are speaking within the confines of a professional relationship. Justice White explained that
a State can require high standards of qualification, such as good moral character or proficiency in its law, before it admits an applicant to the bar....
... Clients trust in investment advisers, if not for the protection of life and liberty, at least for the safekeeping and accumulation of property. Bad investment advice may ... lead to ruinous losses for the client. To protect investors, the Government ... may require that investment advisers, like lawyers, evince the qualities of truth-speaking, honor, discretion, and fiduciary responsibility.
472 U.S. at 229, 105 S.Ct. at 2582-83 (White, J., concurring) (internal quotation marks omitted). Licensed professionals thus occupied a venerated position in Lowe, as these professionals perform functions in society that cannot be trusted to just anyone. And it was only because of this compelling rationale that the unqualified could be silenced at all. Far from venerating professionals who deliver what Lowe recognized to be critical advice, the *914 Act here prohibits licensed medical professionals from exercising them judgment, making inquiries, and engaging in the kind of persistent counseling that they believe will improve the well-being of their patients.
Despite this precedent, the Majority maintains that some lesser level of scrutiny may apply to speech by professionals within the confines of a professional relationship. Instead of recognizing that licensed professionals’ speech is particularly valuable, the State’s decision to silence certain speech is approved by the Majority precisely because the speakers are so qualified. The State could not rely on the Majority’s rationale to, for example, silence non-professionals, who are unqualified to give firearm safety advice, from making inquiries in private about firearm ownership, even though silencing that type of speaker is what Lowe envisioned. Instead, the Majority’s rationale would allow the State to silence any and all professionals who are qualified to give such advice because their speech, when spoken in a private, professional setting is converted from protected private speech to virtually unprotected professional conduct. This turns Lowe on its head.
As amicus favoring the Act seemed to admit, doctors were silenced because their speech was causing patients to question whether the safety concerns associated with firearm ownership outweighed the benefits. The Court has very recently rejected this as an appropriate rationale for silencing speech: “That the State finds expression too 'persuasive does not permit it to quiet the speech or to burden its messengers.” Sorrell, 131 S.Ct. at 2671. It is thus clear that Lowe is distinguishable both factually and based on its rationale. We should not set aside a compelling body of case law that consistently applies First Amendment scrutiny to content-based restrictions based on an extension of an inapplicable line of cases.
2.
Planned Parenthood of Southeastern Pennsylvania v. Casey, 505 U.S. 833, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992), reaffirms that intermediate scrutiny is appropriate here. The regulation in Casey compelled doctors to advise women seeking abortions about various health consequences and alternatives. Id. at 884, 112 S.Ct. at 2824 (plurality opinion). The personal nexus between professional and client that exists here and that existed in Locke was also present in Casey. Unlike Locke, however, Casey involved a regulation targeted at speech about a specific topic within the medical profession rather than a general regulation restricting entry to the profession as a whole. Casey is thus more analogous to this case and helpful in identifying the applicable level of scrutiny, though it is worth noting that the relevant First Amendment discussion consisted only of three sentences in a three-member opinion that did not speak for the Court.[14] Therefore, Casey’s statement— that “First Amendment rights ... [were] implicated” — instructs that the Act is subject to First Amendment scrutiny. See 505 U.S. at 884, 112 S.Ct. at 2824. The fact- that Casey upheld the provision at issue there does not mean that the provision was not subject to any First Amendment scrutiny. That Justice O’Connor’s opinion in Casey did not apply Justice White’s framework from Lowe is not an insignificant detail that can be cast aside. Casey did not apply Justice White’s frame *915 work because Justice White’s framework was inapplicable. That is why Justice White in Lowe and Justice O’Connor in Casey reached opposite conclusions about whether the First Amendment was implicated, and that is why the two opinions cannot be treated as if they applied the same level of scrutiny.
Thus, it is clear that unlike Locke, the regulation in Casey was subjected to some level of First Amendment scrutiny. Given the brevity of Casey’s First Amendment discussion, identifying what level of scrutiny was applied is difficult. Casey noted only that, although the First Amendment applied, the speech was “subject to reasonable licensing and regulation” because it was “part of the practice of medicine.” 505 U.S. at 884,112 S.Ct. at 2824 (plurality opinion). It is clear from this statement that strict scrutiny was not applied. See, e.g., Tex. Med. Providers Performing Abortion Servs. v. Lakey, 667 F.3d 570, 575 (5th Cir.2012) (“The plurality response to the compelled speech claim is clearly not a strict scrutiny analysis.”). The Fourth and Ninth Circuits have characterized Casey as applying “intermediate scrutiny.” See Greater Balt. Ctr. for Pregnancy Concerns, Inc. v. Mayor & City Council of Balt., 683 F.3d 539, 554 (4th Cir.2012), vacated on reh’g en banc on other grounds, 721 F.3d 264 (4th Cir.2013); see also Pickup v. Brown, 740 F.3d 1208, 1228 (9th Cir.2014) (placing Casey at the midpoint on the continuum of First Amendment protections). Other Circuits have not definitively answered the question.
Although Casey did not explicitly state that intermediate scrutiny applied, I believe the Fourth and Ninth Circuits are correct. Immediately before addressing the First Amendment issue, the Court in Casey recognized that the State had “a substantial government interest justifying a requirement that a woman be apprised of the health risks of abortion and childbirth.” 505 U.S. at 882, 112 S.Ct. at 2823 (plurality opinion). The requirement also advanced the “legitimate goal” of ensuring that women do not unwittingly suffer “devastating psychological consequences” of less-than-fully-informed decision making and “protecting the life of the unborn.” Id. at 882, 884, 112 S.Ct. at 2823-24. To advance these goals, the Court found “legislation aimed at ensuring a decision that is mature and informed” to be constitutional. Id. at 883, 112 S.Ct. at 2824 (emphasis added). Further, the Court discussed the ways in which the speech requirement was narrowly drawn: it was limited to “truthful and not misleading” information, and “the statute [did] not prevent the physician from exercising his or her medical judgment” not to provide the information in certain situations. Id. at 882, 884, 112 S.Ct. at 2823-24.
This analysis mirrors an intermediate scrutiny analysis and shows that the law in question passes constitutional muster under that standard. See Sorrell, 131 S.Ct. at 2667-68 (explaining that to survive intermediate scrutiny, “the State must show at least that the statute [1] directly advances [2] a substantial governmental interest and [3] that the measure is drawn to achieve that interest” (citing Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm’n of N.Y., 447 U.S. 557, 566, 100 S.Ct. 2343, 65 L.Ed.2d 341 (1980))). I therefore believe that Casey applied something akin to intermediate First Amendment scrutiny.
Even if the Majority is correct that Casey applied something less than intermediate scrutiny, Zauderer v. Office of Disciplinary Counsel of the Supreme Court of Ohio, 471 U.S. 626, 105 S.Ct. 2265, 85 L.Ed.2d 652 (1985), confirms that intermediate scrutiny applies here. In Zauderer, the Court applied a “reasonable relation” standard of First Amendment review, sim *916 ilar — in wording, though not necessarily in form — to the one applied in Casey. Id. at 651, 105 S.Ct. at 2282 (holding that although the First Amendmeht was implicated, the regulation compelling disclosure of certain information in advertisements was constitutional as long as it was “reasonably related to the State’s interest”). Zauderer explained that the reasonableness standard applied there was less rigorous than intermediate scrutiny, see id. at 651 n. 14, 105 S.Ct. at 2282 n. 14, but the case highlights a distinction that proves intermediate scrutiny applies here, even if it did not in Casey. Zauderer recognized that a restriction on advertising would be subject to intermediate First Amendment scrutiny under the test applied in Sorrell and Central Hudson. Id. at 644, 105 S.Ct. at 2278. “Reasonableness” scrutiny applied only where the provision at issue compelled truthful speech but did not prohibit speech in any way. Id. at 651, 105 S.Ct. at 2281-82. Thus, when speech is prohibited rather than compelled, reasonableness — scrutiny is ratcheted up to intermediate scrutiny. Casey involved a provision compelling speech, while this case involves a prohibition on speech, so even if reasonableness scrutiny was applied in Casey, scrutiny should be ratcheted up to the intermediate level here.[15] This again confirms that a content-based restriction like the Act here will always receive at least intermediate scrutiny.
Thus, while Casey is, as the Majority notes, “consistent with” the Majority’s two-dimensional framework, Casey does not necessarily support that framework; correlation does not imply causation. On the contrary, the weight of binding precedent and persuasive authority suggests that neither Casey nor any other case suggests that anything less demanding than intermediate scrutiny applies here.
3.
Two cases from the Ninth Circuit support this conclusion as well. In Conant v. Walters, the court invalidated a federal regulation prohibiting doctors from recommending the use of medical marijuana after applying heightened First Amendment scrutiny. 309 F.3d 629, 632 (9th Cir.2002). Despite taking place within the confines of a doctor-patient relationship, the regulation was analyzed as a classic content-, speaker-, and viewpoint-based restriction. Id. at 637, 639. By contrast, in Pickup v. Brown, the court held that a California law prohibiting mental health professionals from offering sexual orientation change efforts (SOCE) therapy to minors was immune from First Amendment scrutiny, even though the therapy itself was carried out through words. 740 F.3d at 1225.
Distinguishing Conant, the court drew lines between a professional’s public speech, id. at 1227, a professional’s speech “within the confines of a professional relationship,” id. at 1228 (citing Casey as an example of such speech, and noting that the burdened speech in that case fell on the midpoint of the continuum where First Amendment protections are diminished but not eliminated), and a professional’s conduct which is carried out through speech, id. at 1229. The regulation in Conant, which prohibited doctors from recommending medical marijuana, burdened speech that was entitled, at the very least, to intermediate First Amendment protections. Id. at 1226-27. At the same time, Conant recognized that any speech bur *917 dened as a resült of the law’s ban on prescribing medical marijuana fell into the third, unprotected category, 'id. at 1226, because the ban targets professional conduct (i.e., giving patients drugs) and only incidentally burdens speech (i.e., writing the name of a drug on a prescription pad).
Similarly, the court in Pickup concluded that SOCE therapy, though carried out in verbal form, was indistinguishable from prescribing a drug or performing a surgery. In other words, the burdened speech was exclusively the functional equivalent of the treatment itself. Therefore, banning SOCE therapy was no different than outlawing certain drugs, and the burden on speech (i.e., the ban on speaking words that constitute SOCE therapy) was incidental and necessary to the ban on the disfavored medical conduct (i.e., performing the therapy). Id. at 1230. Pickup recognized that the law at issue went no further in banning speech than necessary to regulate the proscribed medical conduct. Doctors’ right to “express their views to anyone, including minor patients and their parents, about any subject, including SOCE,” was explicitly protected by the act in question. Id. at 1230.
The regulations here, like the regulations in Casey and Conant, burden speech that fits, at the very least, into the intermediate category where First Amendment protections apply. When the Ninth Circuit expanded Lowe’s reasoning in Pickup, it was very careful to narrowly circumscribe the category of speech that was left unprotected. Only speech that is the functional equivalent of performing a surgery or prescribing a drug can be burdened without scrutiny under Pickup. It is well worth noting that the speech burdened in Casey received intermediate scrutiny even though the speech was exclusively intended to fully inform patients about a medical procedure. Thus, even if speech that is the functional equivalent of medical treatment can be regulated without scrutiny, speech that is directly related to medical treatment does not fit within that category under Pickup.
Here, in stark contrast to Pickup where all of the burdened speech was the functional equivalent of providing a drug, none of the speech burdened by the Act fits in that category. Asking irrelevant questions about firearm ownership, recording the answers, or harassing a patient based on firearm ownership — by persistently and irritatingly discussing the subject — is nothing like giving a patient a drug or performing SOCE therapy. Further, some, though by no means all, of the speech burdened by the Act is similar to the speech burdened by the regulation in Casey. To the extent that the Act burdens speech designed to inform patients about the dangers of firearms or speech designed to inform patients of safer ways to own firearms, the speech is much like the speech in Casey. Accordingly, such speech should be given intermediate protections. Strengthening this conclusion is the fact that, while the law in Casey exclusively concerned speech necessary to fully inform patients about a medical procedure, the Act here also burdens speech that is unrelated to this purpose. The Act bans irrelevant questioning and irritating politicking on the subject of firearm ownership, which by definition has nothing whatsoever to do with medical treatment or a medical procedure and is in no way designed to inform patients about anything of medical relevance.
Because the Act burdens such a broad swath of physician speech on the topic of firearms — including speech that by definition has nothing to do with medical treatment — Conant, which applied heightened scrutiny, is directly applicable. Doctors have a First Amendment right to ask *918 questions about firearms and to discuss, even persistently, the pros and cons of firearm ownership with their patients just as surely as they have the right to discuss the pros and cons of medical marijuana. Such communication cannot be labelled unprotected conduct simply because it takes place within the confines of a professional relationship. Pickup does nothing to undermine this principle and in fact reaffirms it, 740 F.3d at 1228, though I make no comment on whether Pickup was correctly decided.[16]
4.
When a doctor asks his patient obviously irrelevant questions, the doctor “does not purport to be exercising judgment on behalf of any particular individual,” so Lowe says that “government regulation ceases to function as legitimate regulation of professional practice with only incidental impact on speech; it becomes regulation of speaking ... as such, subject to the First Amendment! ].” 472 U.S. at 232, 105 S.Ct. at 2584 (White, J., concurring).
Further, as discussed above, the only case that extends Lowe beyond the licensing context, Pickup, also set a limiting principle. Irrelevant questioning by doctors about firearms (for purposes of arranging a hunting trip or going on a political rant) is clearly not the functional equivalent of providing care, which was the only context in which Pickup extended Lowe’s rule. 740 F.3d at 1225. Asking someone whether they engage in a practice (“Do you smoke?”) is far less like medical conduct than discussing the dangers of engaging in the practice (“Smoking causes lung cancer, so you should use X, Y, or Z method to stop.”). It is even more obvious than asking someone an irrelevant question (“Do you own a gun? If so, we should go hunting.”) is far less like medical conduct than discussing firearm safety (‘You should store your firearm and ammunition in separate, locked safes and use a trigger lock.”). Thus it is simply inaccurate to characterize the Act as a regulation on medical conduct rather than a regulation on speech.
The Act is unlike other State laws that only incidentally burden speech; it directly bans questioning. How can it possibly be argued that a law telling doctors, “Do not ask irrelevant questions about guns,” only incidentally burdens the right to ask irrelevant questions about guns? The burden could not be more direct. By contrast, a medical malpractice regime that holds a doctor liable when his unreasonable treatment causes a patient harm has only incidental burdens on speech. Under that regime, liability attaches for prescribing the wrong drug, directly burdening the bad practice of giving patients harmful drugs and incidentally burdening the right to write the name of the drug on a prescription pad. Liability also attaches *919 for failing to properly diagnose a disease, burdening the bad practice of failing to identify a health problem and incidentally burdening the right to remain silent about a medical problem or tell a patient he has a clean bill of health when he does not. Pickup was justified on the same basis. SOCE therapy is analogous to prescribing a harmful drug. Liability could attach for providing SOCE therapy because the therapy had the chance to harm minors psychologically.
As Pickup and Lowe recognized, however, even if quack medicine (or what the State deems to be quack medicine) can be prohibited without scrutiny, doctors cannot be prohibited from talking to their patients about quack medicine. See 472 U.S. at 231, 105 S.Ct. at 2584 (White, J., concurring) (“I do not think [the State] could make it a crime ... privately to speak urging persons to follow or reject any school of medical thought.” (internal quotation marks omitted)); 740 F.3d at 1228 (holding only that “[a] doctor may not counsel a patient to rely on quack medicine” but recognizing that a doctor may talk to patients about quack medicine such as SOCE (emphasis added) (internal quotation marks omitted)). I believe that a doctor’s First Amendment challenge would prevail if a doctor faced liability for speaking about but not performing or inducing reliance upon quack medicine, because such a burden on speech would be direct, not incidental to the State’s goal of preventing bad medical care.
Applying this rationale here, had the State drafted a law stating that it is bad medicine to counsel patients on firearm safety and that, accordingly, doctors may not, as part of the practice of preventive medicine, counsel patients on firearm safety, we might be dealing with a regulation like malpractice laws and like the law in Pickup. Further, had the State drafted such a law, then the opening question in a firearm safety counseling session — a session that is prohibited as bad medicine under this hypothetical — would likely also be prohibited. In that case, the ban on the question might truly be incidental to the overall ban on (what the State deems) bad medical practice. I have expressed my doubts as to whether such a ban would evade First Amendment scrutiny, but that ban would be more likely to do so than the Act.
By contrast, the Act allows firearm counseling to continue, so it is not directly regulating medical conduct or declaring a certain form of treatment bad medicine. At the same time, the Act directly bans asking irrelevant questioning about firearms — even, indeed especially, those questions having nothing to do with medical conduct. The Act thus directly targets questioning and only incidentally advances whatever medical interests might be served by a law eliminating irrelevant questions about firearms from the doctor’s office. The burden on speech is direct. The benefit to medical care is, at best, incidental and indirect. The Supreme Court has explicitly recognized that States cannot advance their interests in this way. See Sorrell, 131 S.Ct. at 2670 (recognizing that the First Amendment prohibits laws where “[t]he State seeks to achieve its policy objectives through the indirect means of restraining certain speech by certain speakers”).
IV.
The foregoing leads to the conclusion that nothing less than intermediate First Amendment scrutiny applies. For the Act to survive, “First, the government must assert a substantial interest in support of its regulation; second, the government must demonstrate that the restriction ... directly and materially advances that in *920 terest; and third, the regulation must be narrowly drawn.” Went For It, 515 U.S. at 624, 115 S.Ct. at 2376 (internal quotation marks omitted); see also Sorrell, 131 S.Ct. at 2667-68; Central Hudson, 447 U.S. at 566, 100 S.Ct. at 2351. “[Intermediate scrutiny] standards ensure not only that the State’s interests are proportional to the resulting burdens placed on speech but also that the law does not seek to suppress a disfavored message.” Sorrell, 131 S.Ct. at 2668.
Under the first prong of this analysis, we may not “supplant the precise interests put forward by the State with other suppositions.” Went For It, 515 U.S. at 624, 115 S.Ct. at 2376 (internal quotation marks omitted). Intermediate scrutiny’s second prong “is not satisfied by mere speculation or conjecture; rather, a governmental body seeking to sustain a restriction on commercial speech must demonstrate that the harms it recites are real and that its restriction will in fact alleviate them to a material degree.” Id. at 626, 115 S.Ct. at 2377 (internal quotation marks omitted).
The Court has not clearly established the evidentiary requirements necessary to survive the second prong of intermediate scrutiny, but Went For It explains that if the State presents “no studies,” and “the record [does] not disclose any anecdotal evidence ... [but instead] tended to contradict, rather than strengthen” the State’s argument, then the evidence is insufficient. Id. Sorrell clarifies that “a few” anecdotal stories are not necessarily sufficient to establish that the harm posed to the State’s interest is real. See 131 S.Ct. at 2669.
Finally, under the third prong of intermediate scrutiny, we do not apply the least restrictive means test, at the one extreme, or rational basis review, at the other. Went For It, 515 U.S. at 632, 115 S.Ct. at 2380. Instead we look for a narrowly tailored fit between the State!s chosen means and its asserted ends, though the Act need not be a perfect fit. Id. Sorrell also clarifies that if a regulation burdening speech is under-inclusive, addressing but one area of a larger problem, this is evidence that the justification may be insufficient to sustain the law under intermediate scrutiny. 131 S.Ct. at 2668.
The State asserts the following interests: (1) securing and improving healthcare, particularly for firearm owners; (2) protecting firearm owners’ privacy rights; (3) protecting Second Amendment rights; and (4) preventing discrimination against and harassment of firearm owners. I assume that each of the State’s asserted interests is substantial but ultimately conclude that all four relevant provisions of the Act fail under the second and third prongs of this analysis because, while the interests are substantial, the interests are either not under threat by activities proscribed by the Act, or the Act at most indirectly and marginally advances them.
A.
The record suggests that the Act will make healthcare in Florida worse, not better. That is not my opinion. It is the opinion of many leading medical associations, including the AMA. If there is significant disagreement with this opinion in the medical community, the State did not mention it. There is simply no evidence showing that inquires about firearms during medical examinations negatively affected medical care or the health and well-being of patients.
The available evidence does establish two things: first, the healthcare of everyone who is happy to answer their doctors’ inquiries about firearms may suffer as a result of the Act; second, the First Amendment rights of everyone who welcomes their doctors’ inquiries and informa *921 tion on firearms have been infringed. As to the first point, the medical community thinks doctors ought to be free to ask about firearms in order to provide patients with potentially life-saving information, but because of this law, they will not do so. A vivid imagination is not required to think of the innumerable adverse health consequences that go along with unsafe firearm ownership, but those health consequences are now more likely to befall people who would have welcomed a doctor’s inquiry into firearms ownership.
As to the second point, “the protection afforded [by the First Amendment] is to the communication, to its source and to its recipients both.... [F]reedom of speech necessarily protects the right to receive.” Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc., 425 U.S. 748, 756-57, 96 S.Ct. 1817, 1823, 48 L.Ed.2d 346 (1976) (internal quotation marks omitted). The right to receive is burdened here, and by cutting off even the opening question in the firearm conversation, the Act virtually eliminates that right altogether. It is anathema to the First Amendment to treat truthful, non-misleading information the same way we would treat a dangerous drug. “The First Amendment directs us to be especially skeptical of regulations that seek to keep people in the dark for what the government perceives to be their own good.” Sorrell, 131 S.Ct. at 2671 (internal quotation marks omitted).
This Act does not even give patients the option to consent to the doctors’ questioning on firearms. In Sorrell, the Court explained that “private decisionmaking can avoid governmental partiality and thus insulate privacy measures from First Amendment challenge.” Id. at 2669. Here, because there is no mechanism for patients to consent, private decisionmaking between doctors and patients on the topic of firearms has been drastically reduced. Governmental partiality favoring firearm ownership predominates, and messages against firearm ownership are drastically limited if not entirely prevented from reaching people who want to hear them.
Considering only the healthcare of firearm owners, there is no evidence that the quality of their care diminished when doctors found out they owned guns. There is also no evidence that their ownership status was improperly disclosed. Indeed firearm owners are the ones most likely to benefit from the information provided by doctors on this subject, and there is evidence suggesting that many firearm-owning patients appreciated the information. As in Sorrell, “The defect in [the] law is made clear by the fact that many listeners find [the information] instructive.” Id. at 2671.
The only people who arguably stand to benefit medically from the Act are those who voluntarily choose not to answer their doctors’ questions about firearms. Without the Act, doctors are free to ask firearm-related questions, and people who refuse to answer such questions may be denied care as a result. With the Act, people who refuse to answer questions may still be denied care, see Fla. Stat. § 790.338(4), but firearm-related questions will be asked very rarely, giving doctors fewer occasions to find out that patients would be non-cooperative and thus fewer occasions to deny care on this basis. That is a potential benefit, but it is a slight one with great costs. Therefore, the burden on speech does not meet the standards of proportionality discussed in Sorrell.
It is important to recall that there is no evidence suggesting that firearm owners were denied care because they were firearm owners. The only patients who were denied care were those who refused to answer a doctor’s questions, and thus, the *922 doctor did not even know whether the patient was a firearm owner. Doctors understand that they cannot do their jobs— and risk medical malpractice liability — if they fail to inquire broadly. Patients who resist inquiries make doctors’ jobs more difficult and present doctors with risks that compliant patients do not. Doctors thus have a significant interest in speaking freely, making inquiries, and recording patients’ answers.
Of course, if patients wish not to answer, they are free not to. Ordinarily, those who wish not to answer questions receive “ample protection from [their] unquestioned right to refuse to engage.” Sorrell, 131 S.Ct. at 2670 (internal quotation marks omitted). These patients may freely choose another doctor whose questioning comports with the patients’ sensibilities, and there is no evidence in the record suggesting that any non-compliant patients who were turned away could not find other doctors.
To justify forcing doctors to relinquish their freedom to ask questions solely as a means to protect patients’ freedom not to answer questions, the State would have to show that patients faced a dilemma of sorts and that refusing to answer was not a sufficient solution. Beyond failing to offer evidence that patients were unable to find other doctors, the State has offered no evidence to suggest that patients would have sacrificed anything by answering the doctors’ questions. There is no evidence that the information obtained through these inquiries was misused. It has not been disclosed, and care did not diminish for those who answered. Thus, patients appear from the record to face a perfectly free choice when presented with a doctor’s questions about firearms: they may find a new doctor or answer the question (which has no adverse consequences and, if anything, may lead to a lifesaving conversation). These are not bad options, and are far better options than those available to the grieving father whose son’s funeral draws harassing, vile protests. See Snyder, 131 S.Ct. at 1213. If the First Amendment protects funeral protests, the “benign and, many would say, beneficial” inquiries and conversations about firearms that are burdened by the Act are “also entitled to the protection of the First Amendment.” Sorrell, 131 S.Ct. at 2670.
Further, there is no evidence that the options faced by patients who refused to answer questions about firearms were any worse than the options faced by those who refused to answer any other private, potentially irrelevant question. That the right to refuse to answer questions about firearms garners special protection belies the State’s preference — a preference not designed to ensure that patients who wish to protect their privacy will have access to medical care but instead designed to protect a pro-firearm message the State prefers. See id. at 2668 (explaining that a State’s failure to address a wider problem through a “coherent policy” addressing the problem as a whole is evidence that the asserted interest cannot justify the burden placed on speech (internal quotation marks omitted)).
Finally, one amicus curiae favoring the Act suggests that the Act will improve healthcare by improving the doctor-patient relationship. The argument, as far as I can tell, goes as follows: previously, firearm owners were unwilling to share firearm-ownership information with their doctors because they feared — without any evidence to validate this fear — that doctors might be gathering this information for nefarious purposes. Once doctors had the information, patients feared that doctors would, in violation of ethical principles and several laws, pass the information to government bureaucrats.
*923 Now, however, because doctors are told not to ask irrelevant questions about firearms, patients can rest assured that if doctors ask about firearms, it is relevant, so patients know it is in their best interest to answer the question. Of course, there are no additional protections prohibiting the doctor from disclosing this information, so the original fear remains in full force. But firearm owners also know that the health consequences of not answering are probably more serious now, because the question is more relevant. Thus, the calculus changes slightly: answering, while potentially detrimental to privacy rights, becomes more appealing because not doing so is more likely to be detrimental to healthcare.
This argument accepts the premise that conveying information about a patient’s firearm ownership to her physician is potentially beneficial to the patient’s health. The argument also accepts the premise that, because this information is potentially vital to effective healthcare, it is important that the flow of information between doctor and patient be unobstructed. Thus, the amicus curiae reasons, the Act improves healthcare because it removes a potential ■ obstruction — suspicion that the privacy consequences of disclosing firearm ownership outweighs the health benefits— that was blocking the free flow of information between doctor and patient on the subject of firearms. If this was the Legislature’s goal, its chosen means are poorly suited to the task. In order to remove an obstruction to the flow of information, the State eliminated the flow altogether. This simply does not withstand intermediate scrutiny.
Even if we accept the unlikely premise that firearm owners who were unwilling to disclose firearm ownership information to their doctors before this Act was passed will be willing to do so now, there is no doubt that this law will cause doctors to know less, not more, about their patients’ firearm ownership status. As the amicus curiae suggests, this information is potentially important to patients’ well-being. Much of that lost information will include information of initially questionable relevance that, only after it is too late, will prove to be critical. That is bad for people’s health. The State falls far short of showing that the Act directly and materially advances healthcare for anyone. At most, “[t]he State seeks to achieve its policy objectives through the indirect means of restraining certain speech by certain speakers.” Sorrell, 131 S.Ct. at 2670. Such efforts do not survive intermediate scrutiny.
B.
The State next asserts an interest in promoting the privacy of firearm owners. It may be assumed that firearm owners “have an interest in keeping their [ownership status] confidential But [the Act] is not drawn to serve that interest.” Id. at 2668. Indeed, it is entirely unnecessary to serve that interest.
This argument launches from a premise that fundamentally misunderstands one of the primary purposes of keeping medical information confidential. The best way to ensure that confidential information is not divulged through our doctors is to avoid sharing any information with doctors at all. But if we took that view, doctors would obviously not be very effective. The information we give them has the potential to save our lives, so we should give it freely, and doctors should ask for it without hesitation.
Given that information-sharing with our doctors has life-saving potential, the medical community and the State have built high walls around the doctor-patient relationship to ensure that within those walls, *924 there are no secrets. Therefore, while the State has a strong interest in protecting the confidentiality of medical records, any claim that the Act, which directly burdens speech and limits information-sharing, is justified by these concerns is suspect from the outset. The Act itself causes the very harm confidentiality is designed to prevent: limiting the flow of information from doctor to patient.
In any event, for the State to justify burdening speech in order to further its interest in patient confidentiality, it must show that this Act directly and materially addresses a real concern. The concern that firearm ownership status, if recorded in medical files, will not remain confidential is entirely speculative and therefore insufficient. Went For It, 515 U.S. at 626, 115 S.Ct. at 2377.
The record reflects no incidents of firearm-ownership information from medical records being disclosed to outside parties, and there are a variety of measures in place to ensure that such incidents will never occur. In addition to ethical principles, the confidentiality of medical records is secured by state and federal laws discussed by the Majority, Maj. Op. at 898, n. 24. It was also suggested at oral argument that, as a result of the Affordable Care Act and the digitization of medical records, government bureaucrats may somehow gain access to medical records, providing the government with information on firearm ownership. To the extent that such information is not already available from other sources, the Affordable Care Act explicitly prohibits the information from being gathered through medical records: “None of the authorities provided to the Secretary under the [Affordable Care Act] ... shall be construed to authorize or may be used for the collection of any information relating to (A) the lawful ownership or possession of a firearm or ammunition; (B) the lawful use of a firearm or ammunition; or (C) the lawful storage of a firearm or ammunition.” 42 U.S.C. § 300gg-17(c)(2). Patients also may refrain from disclosing their firearm ownership status, which, as discussed above, has not proven to be detrimental to anyone’s care except in ways that befall all uncooperative patients, not just those who refuse to answer questions about firearms.
Given that the confidentiality of medical records is closely guarded already, the need to further ensure privacy to prevent misuse cannot justify the burden placed on doctors’ speech by the Act: “The choice between the dangers of suppressing information, and the dangers of its misuse if it is freely available is one that the First Amendment makes for us.” Sorrell, 131 S.Ct. at 2671 (internal quotation marks omitted).
The State also suggests that, even if information is kept confidential from the outside world, patients may still incur adverse consequences and a loss of privacy if other medical professionals are able to determine firearm ownership status from medical records. Again, the harm addressed here is entirely speculative. Those doctors and medical personnel are bound by the same confidentiality restrictions just discussed. And there is no evidence to validate the State’s fear that patients whose firearm ownership is recorded in their medical files will receive worse care from subsequent doctors as a result of this information. Fear of this type is purely speculative and cannot satisfy the State’s burden under intermediate scrutiny.[17] See Went For It, 515 *925 U.S. at 626, 115 S.Ct. at 2377. As the Court has explained, “[p]rivacy is a concept too integral to the person and a right too essential to freedom to allow its manipulation to support just those ideas the government prefers.” Sorrell, 131 S.Ct. at 2672.
Finally, the Majority relies on patients’ interest in protecting private information, including status as a firearm owner, from their own physicians. See Maj. Op. at 897 n. 23, 898. If the State merely wants to reserve for patients the right to decide whether to disclose firearm ownership, the Act is a poor fit. It does not allow individual patients to decide that their firearm ownership status is none of their doctors’ business. Instead, the patient never has the chance to make the decision because the doctor is unable to broach the sub-* ject.[18] A better tailored provision would allow physicians to inquire and simply require them to respect their patients’ decision to decline to answer. But the Act does the opposite. It allows doctors to refuse to see patients who decline to answer. See Fla. Stat. § 790.338(4). Therefore, with this particular privacy interest in mind, the Act plainly is more extensive than necessary to serve patients’ interest in keeping the information from their doctors and fails under the third prong of intermediate scrutiny.
C.
In the same way, if a physician waits until the risk of gun ownership manifests itself in a suicide, homicide, or accidental shooting, the physician will have missed the opportunity to prevent such an adverse potential consequence of gun ownership. Yet this is precisely the situation the Act forces upon not just physicians but also their patients, who will, more directly and forcefully, feel the consequences of the Act’s “wait until something bad happens” mandate.
The State next asserts that the Act protects Second Amendment rights. There is *926 no doubt that the right to keep and bear arms is guaranteed by the Second Amendment and that the State has an interest in protecting that right. It is unclear, however, what threat doctors pose to Second Amendment rights. Doctors do not have the ability to seize patients’ weapons nor is there any evidence that they have ever tried to do so. Doctors are also not agents of the government, so to the extent that doctors send a one-sided message that firearm ownership causes more harm than good, that message does not convey government disapproval that might raise Second Amendment concerns. Like any other group of private citizens, doctors are free to express their views on firearm ownership, and the ordinary expectation is that a person’s rights to be free from unwanted speech are amply protected by the “unquestioned right to refuse to engage in conversation.” Sorrell, 131 S.Ct.. at 2670.
While it is true that within the confines of a doctor’s office, doctors can persuade us to do things we would not do for other private citizens, it is also true that as soon as we leave, that power diminishes drastically. If a doctor recommends that I remove a firearm from my home, I am perfectly free to ignore him when I get home. If I take his advice, however, I cannot complain that my right to own a gun was infringed upon any more than a patient who quits smoking after his doctor told him to do so can complain that his doctor violated his right to smoke. The Second Amendment does not include a right to be free from private persuasion. The State’s Second Amendment argument is essentially “that the force of [doctors’] speech can justify the government’s attempts to stifle it. Indeed the State defends the law by insisting that [doctors] ha[ve] a strong influence .... This reasoning is incompatible with the First Amendment.” Id. at -2671.
The State clearly has not expressed a general interest in preventing doctors from “infringing on patients’ rights” by giving advice not to exercise certain rights in certain ways. The State has not expressed this general interest even though doctors routinely ask about a range of things other than firearms which are not immediately relevant to our care and which may implicate our rights. This is almost certainly because the State approves of doctors asking about these other topics. As for guns, however, the State disagrees with doctors that questioning patients about firearms is relevant to medical care, and it disapproves of persistent discussion on the topic that might passionately convey an anti-firearm message. So the State silenced that message and that message alone, under a guise of protecting rights. It is clear that “[t]he State’s interest in burdening the speech of [doctors] turns on nothing more than a difference of opinion:” Id. at 2672. Such differences of opinion cannot be regulated out of existence.
For the right to bear arms to be under serious threat from doctors — a threat sufficient to justify a State response that intrudes on doctors’ rights to speak — doctors must be doing more than simply persuading firearm owners to voluntarily relinquish their arms. They must be doing more than what one amicus curiae favoring the Act claims doctors are doing, which is ■“question[ingJ [patients and thereby] interfering] with patients’ exercise of the right [to bear arms] by putting patients in a hesitant position where they question their ownership of firearms because of physician disapproval.” Indeed much of what good doctors do is question patients about certain behavior thereby expressing disapproval of the behavior (psychologists ask us why we say certain things to people we are having difficulties with;' cardiologists ask us if we routinely eat unhealthy *927 foods; internists ask us if we get enough sleep, drink too much soda and not enough water, and whether we engage in unsafe sexual practices), and (hopefully) causing us to question whether we should continue to engage in that harmful behavior. No one disputes that it is anyone’s right to engage in any of the aforementioned activities, and there is absolutely no evidence that doctors are intruding on firearm owners’ rights any more than doctors are intruding on any of the above-mentioned rights. That we have a right to do something does not mean we have a right to be free from questioning about that right or from suggestions of other people — people we voluntarily went to see for advice on how to live healthy lives — who may tell us that exercising a particular right in a particular way is a bad idea.
As for other potentially more compelling means of persuasion a doctor could use, such as refusing treatment or providing worse treatment unless patients give up their arms, there is absolutely no evidence that such means are being used. Such speculative fears are insufficient to justify a regulation that is subject to intermediate scrutiny. Went For It, 515 U.S. at 626, 115 S.Ct. at 2377.
Perhaps one could respond, as noted above, that preventing doctors from asking firearm-related questions in most situations will ensure that fewer people are put in a position of being turned away for failing to answer such questions. But the right to bear arms does not include a right not to be asked a question about whether one bears arms. “Personal privacy even in one’s own home receives ‘ample protection’ from the ‘resident’s unquestioned right to refuse to engage in conversation with unwelcome visitors.’ Watchtower Bible & Tract Soc. of N.Y., Inc. v. Village of Stratton, 536 U.S. 150, 168, 122 S.Ct. 2080, 153 L.Ed.2d 205 (2002). A physician’s office is no more private and is entitled to no greater protection.” Sorrell, 131 S.Ct. at 2670 (second citation omitted). This statement was rendered with regard to doctors in their own offices. If they do not have a right to be free from unwelcomed visitors in their own offices, patients who voluntarily chose to visit doctors certainly do not have greater protections from questioning by the doctors themselves. That is particularly true when, as already explained, the answer to any question about firearms will not lead to adverse consequences.
With regard to the State’s asserted Second Amendment justification, like its medical justification, “[t]he State seeks to achieve its policy objectives through the indirect means of restraining certain speech by certain speakers.... But the fear that people would make bad decisions [such as relinquishing their firearms] if given truthful information cannot justify content-based burdens on speech.” Id. at 2670-71 (internal quotation marks omitted). The fact that a doctor’s message on firearm safety may be incompatible with the State’s desire to protect firearm owners from uncomfortable questioning or counseling on firearm safety does not implicate Second Amendment concerns and belies the State’s desire simply to silence a message with which it disagrees.
D.
The State finally asserts that the Act is designed to prevent harassment and discrimination against firearm owners. The State provides very little evidence — no more than a few anecdotes — to support its contention that patients are being discriminated against and harassed on the basis of firearm ownership. It is doubtful whether such evidence is sufficient to establish that the Act will advance an interest in a “direct and material way.” Went For It, 515 *928 U.S. at 625, 115 S.Ct. at 2377 (internal quotation marks omitted). A “governmental body seeking to sustain a restriction on ... speech must demonstrate that the harms it recites are real and that its restriction will in fact alleviate them to a material degree.” Id. at 626, 115 S.Ct. at 2377 (internal quotation marks omitted).
Regarding harassment in particular, the chill that the harassment provision puts on doctors’ protected speech is significant, and the benefit of the provision is minimal given how innocuous the “harassment” that allegedly takes place seems to be. As discussed in Part I, a doctor’s simple recommendation to remove firearms from a home where children were present was one of the incidents that prompted passage of this Act and that presumably would constitute “harassment.”[19] Even if doctors might not ultimately be disciplined for such behavior, this Act will certainly cause many of them not to engage in it.
Were the evidence of harassment against firearm owners greater, and had the legislative history not explicitly stated that the Act was needed to prohibit doctors from advising patients to relinquish firearms in pursuit of a political agenda— that is, were it not apparent that the State’s goal was to eliminate unpopular speech rather than harassment — the constitutionality of the harassment provision may well be different. But that is not the case before us. Confronted with nearly identical anecdotal evidence of harassment in Sorrell, the Supreme Court stated: “[A] few have reported that they felt coerced and harassed.... It is doubtful that concern for ‘a few’ physicians who may have ‘felt coerced and harassed’ ... can sustain a broad content-based rule like” the Act. 131 S.Ct. at 2669. The same is true here, and the harassment provision cannot withstand intermediate scrutiny as a result. Indeed, “[m]any are those who must endure speech they do not like, but that is a necessary cost of freedom.” Id.
The discrimination provision presents a closer question. To begin with, unlike the inquiry, recording, and harassment provisions, speech is less directly targeted by this provision of the Act. A doctor could inquire into and record information about firearms with little fear of facing a discrimination charge simply for doing those things. That does not mean, however, that if the discrimination provision remained, no speech would be prohibited or chilled.
While less obviously so, a doctor who presses a patient on the issue of firearm ownership, engages in tough questioning on the subject, and recommends repeatedly that a patient remove firearms from his home could be seen as discriminating against that patient. We would typically think of such behavior more as harassment than as discrimination, but the Act itself does not define either.[20] A patient who is *929 subjected to relatively harsh, tough-love treatment from a doctor could easily believe he is being discriminated against because he owns a firearm — other patients who do not own firearms are not being persistently lectured by their doctors, but patients who do own firearms are being scolded precisely because they own firearms. That, it seems to me, could be discrimination prohibited by the Act.
Further, even if the other three provisions of the Act are struck down, doctors’ inquiries will be chilled as a result of the discrimination provision. Inquiries constitute strong evidence of discriminatory motive, see, e.g., Barbano v. Madison Cnty., 922 F.2d 139, 141-46 (2d Cir.1990), and doctors will rightly fear that if they ask about firearms and patients subsequently complain about any aspect of their treatment, the doctors’ initial inquiries will be used as ammunition against them to support discrimination claims. Even standing alone, the discrimination provision thus prohibits and significantly chills firearms related speech by doctors, though it probably has a lesser effect on speech than the Act’s other provisions.
Accordingly, I reject the State’s assertion that the discrimination provision evades First Amendment scrutiny as a regulation of discriminatory conduct, not speech. To be sure, the Supreme Court has explained that anti-discrimination provisions designed to address discriminatory conduct “do not, as a general matter, violate the First or Fourteenth Amendments.” Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos., 515 U.S. 557, 571-72, 115 S.Ct. 2338, 2346, 132 L.Ed.2d 487 (1995) (emphasis added). But this is not a typical anti-discrimination law or a typical case, because unlike the statute before the Court in Hurley, the Act here is “unusual in an[ ] obvious way, since it does ..., on its face, target speech ... on the basis of its content.” Id. at 572, 115 S.Ct. at 2347.
The State offered almost no evidence of conduct-based discrimination. Indeed, the only actual examples of adverse conduct cited by the State befell people who refused to disclose firearm status, not people who were known firearm owners. There was an incident involving billing for services allegedly not rendered, but that involved a patient who was turned away for refusing to answer questions. And other patients were declined for service, which constitutes discriminatory conduct, not speech, but they were declined for service because, again, they refused to answer questions, not because they were known firearm owners. Thus, there is evidence that people are being discriminated against for refusing to answer their doctors’ questions, but there is no evidence that patients are being discriminated against because they own firearms.[21]
The State simply cannot support its assertion that the Act is a means of preventing that type of discrimination against firearm owners because those examples do not constitute discrimination against firearm owners. And even if they did, the Act expressly allows doctors to turn away patients who refuse to answer questions, see Fla. Stat. § 790.338(4), so it cannot be justified as an effort to eliminate that form *930 of discrimination, either. Further, the Act is unnecessary to protect patients from being billed for services not rendered, as other remedies surely exist to resolve that problem. As for the State’s list of other examples of discriminatory conduct that might occur on the basis of firearm ownership (denial of referrals, longer wait times, and cancelled appointments, to name a few), the State has presented no evidence that any of these forms of discrimination against firearm owners have ever occurred.
Thus, while it is clear that speech will be burdened as a result of this provision, it is unclear that any discriminatory conduct will be eliminated. As Went For It explains, a statute cannot .survive intermediate scrutiny on the assumption that it will solve an entirely speculative problem. See 515 U.S. at 626, 115 S.Ct. at 2377. This also proves that, unlike in Hurley, where a discrimination provision was found not to implicate the First Amendment, here the “focal point of [the] prohibition [is not] on the act of discriminating against individuals in the provision of publicly available ... services.” 515 U.S. at 572, 115 S.Ct. at 2347 (emphasis added). The legislative history makes clear that the Act was intended primarily to prohibit speech, though I recognize that it may prohibit some discriminatory conduct if that type of conduct ever occurs in the future. Given these facts, the First Amendment applies even to anti-discrimination laws. See, e.g., Saxe, 240 F.3d at 206-07 (“ ‘Where pure expression is involved,’ antidiscrimination law ‘steers into the territory of the First Amendment.’ DeAngelis v. El Paso Mun. Police Officers Ass’n, 51 F.3d 591, 596 (5th Cir.1995). This is especially true because, as the Fifth Circuit has noted, when anti-discrimination laws are ‘applied to ... harassment claims founded solely on verbal insults, pictorial or literary matter, the statutefs] impose[ ] content-based, viewpoint-discriminatory restrictions on speech.’ DeAngelis, 51 F.3d at 596-97.” (alterations in original)).
Therefore, the discrimination provision is also subject to intermediate scrutiny, and the State has failed to show that this provision addresses a real harm or advances a State interest in a direct, material way. See Went For It, 515 U.S'. at 626, 115 S.Ct. at 2377. The Act is instead directed at silencing doctors who advance an anti-firearm — not an anti-firearm owner — viewpoint with which the State disagrees. This it cannot do. See Sorrell, 131 S.Ct. at 2668 (“[Intermediate scrutiny standards] ensure not only that the State’s interests are proportional to the resulting burdens placed on speech but also that the law does not seek to suppress a disfavored message.”).
V.
I also believe the Act to be void for vagueness. At the outset, because this “law interferes with the right of free speech ..., a more stringent vagueness test should apply.” Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc., 455 U.S. 489, 499, 102 S.Ct. 1186, 1193-94, 71 L.Ed.2d 362 (1982); see also Reno v. ACLU, 521 U.S. 844, 871-72, 117 S.Ct. 2329, 2344, 138 L.Ed.2d 874 (1997) (explaining that the “vagueness of [a speech-related] regulation raises special First Amendment concerns because of its obvious chilling effect on free speech”).
Under this standard, based on the Majority’s own interpretation of the Act, the Act is vague as to one of the most common firearms-related practices doctors actually engage in — namely, the practice of asking patients about firearm ownership in questionnaires that are given as a matter of course before the doctor and patient ever meet. Many doctors claim that such inqui- *931 ríes are always potentially relevant and that making them is part of the practice of good medicine. Consequently, doctors need to know if they can continue to ask patients about firearm ownership as a matter of course by using intake questionnaires.
Because the inquiry provision is written “in terms so vague that persons of common intelligence must necessarily guess at its meaning and differ as to its application, [it] violates the first essential of due process of law.” Harris v. Mexican Specialty Foods, Inc., 564 F.3d 1301, 1310 (11th Cir.2009) (internal quotation marks omitted). One might think that when doctors ask questions about firearm ownership as a matter of course, they do not “know” the questions to be irrelevant, nor is the record (the questionnaire itself is a record) kept in the absence of a “good faith” belief that the record is relevant. Some might conclude from this that doctors are free to continue asking all patients about firearm ownership as they did before the Act’s passage. On the other hand, the legislative history suggests that such questioning, absent patient-specific information, is exactly the type of speech the Act was designed to prohibit.
Further highlighting the Act’s vagueness, the State is not even clear on whether the inquiry provision is advisory or mandatory. Initially, the Board responsible for enforcing the Act informed doctors that it was mandatory. Then, the Board changed course and stated that it was advisory. Similarly, as discussed in Part II, the State’s characterization of the inquiry provision is internally contradictory, describing it at times as advisory and at times as a proscription. Again, people of common intelligence are left guessing what the Act prohibits.
Not surprisingly, plaintiffs have responded to this Act in a variety of ways, further confirming that people of common intelligence do not know what the Act prohibits. See Maj. Op. at 874 n. 5. Some doctors have continued making inquiries about firearm ownership as a matter of course because they believe the Act allows them to do so. Others have stopped this questioning — even though they believe, consistent with AMA policy, that the inquiries are good for patients — because they believe the Act requires them to do so. Plaintiffs possess at least common intelligence, and they, too, are left guessing.
Compounding this problem, the State suggests that doctors can and should continue to counsel patients on firearm safety. So if it is good to give patients firearm safety instructions, how can it possibly be bad to ask questions of patients in order to specifically tailor those instructions? That, it seems to me, suggests that asking about firearm ownership is indeed always relevant. Assuming the Act is mandatory, however, I must confess that I myself am left guessing what the inquiry provision prohibits.
Relatedly, the prohibition on routine inquiry — assuming there is such a prohibition — leaves physicians in a hopeless bind. If a doctor is to reach the good faith conclusion that firearm safety is relevant to a particular patient, he must first inquire of that patient whether the patient or a'family member keeps a firearm in the home or some other place where the patient may access it. But the doctor cannot do that without his good faith belief as to relevance. How can the Act require an individualized assessment that the Act itself renders impossible? If a doctor may not inquire on the subject, what then would allow a doctor to conclude that a firearms discussion was relevant? A patient volunteering that he keeps a gun at home would likely meet the standard, though this strikes me as likely to be a *932 rare occurrence. What else? Would the patient’s wearing a T-shirt emblazoned with the National Rifle Association’s logo be sufficient? Such a circular prohibition does not “give the person of ordinary intelligence a reasonable opportunity to know what is prohibited” and certainly will “lead citizens to steer far wider of the unlawful zone.” See Grayned v. City of Rockford, 408 U.S. 104, 108-09, 92 S.Ct. 2294, 2298-99, 33 L.Ed.2d 222 (1972). The inquiry provision, then, is unconstitutionally vague.
The harassment provision, which bans only unnecessary harassment, also leaves people of common intelligence guessing about how far doctors may go in counseling patients on firearm safety. Intuitively, when doctors are initially met with resistance from patients on a medically important subject, doctors should persist for the good of the patient. For example, if a doctor knows a patient smokes and advises him of the dangers of doing so, a patient may become irritated. While the doctor should perhaps take a different approach to his counseling, he certainly should not simply cease. the counseling because the patient is irritated. Indeed, the doctor will likely have to be more persistent and irritating with this smoker than with the smoker who responds favorably to the doctor’s initial counseling, signaling that the doctor’s message has been received.
One might think that the same is true of firearm owners. If a doctor’s initial counseling is well-received by the patient, the doctor knows that the message has been received, so he need not broach the subject again. But if a doctor’s initial counseling is met with resistance, intuition suggests that this patient may be — like the smoker resistant to counseling on the subject — the one most in need of further counseling. Here, the Act creates uncertainty. If the doctor persists, he is no doubt harassing the patient. The question is, however, is that harassment necessary?
Of course, the doctor does not know with any great precision because he cannot ask about firearm ownership, compounding the problem further. Medical intuition perhaps tells the doctor that persistence is necessary, but the doctor is left with no guidance on whether this intuition is sufficient to render persistence (i.e., harassment) necessary for purposes of the Act. Legislative history would suggest that this is exactly the point at which doctors are supposed to stop, but it simply is not clear from the Act what doctors may be punished for doing. The Majority’s suggestion that doctors may engage in brief, generalized discussions does no good because the doctor may know, from the patient’s reaction, that the initial discussion did no good whatsoever. The Majority’s further suggestion that, in some cases, a doctor máy conclude based on a patient’s particular circumstances that the need to persist will be clear, also offers doctors no guidance oh how to proceed in the vast majority of cases, where the need to persist will not be obvious.[22] Yet again, people of common intelligence are left guessing.
Again, the uncertainty is compounded by the fact that the State claims firearm safety counseling is often, if not always, good for patients. If that counseling is good for patients, then it makes no sense to limit that counseling to the distribution of a pamphlet and a generic discussion that is likely to have little to no impact. Instead, if the counseling is good, common sense tells doctors that they ought to persist in that counseling, even past the point of irritation. It is anyone’s guess whether doctors may continue doing so after to *933 day’s holding, or whether they will instead lose their licenses to practice medicine.
The people who put forward these contradictory and at times internally inconsistent interpretations of the Act possess common, if not exceptional intelligence. If they are left guessing about what the Act prohibits, that all but proves that the Act is vague. Sadly, I suspect that some of the practices doctors have continued to engage in despite the Act will probably subject these well-intentioned doctors to discipline, but like them, I simply do not know.
Exacerbating the situation is the prospect of malpractice liability. If firearm safety counseling — -whether brief of extended — is capable of reducing the prospect of accidental firearm related injuries, as the AMA believes it is, then to avoid liability, doctors should provide firearm safety counseling. If that counseling is too brief or too generic — because a pediatrician sought to comply with the inquiry and harassment provisions of the Act — but it can be proven that more persistent, specifically tailored counseling would have prevented a child who found her father’s loaded, unlocked firearm from accidentally shooting herself, I suspect a jury may well find the doctor liable. And regardless of whether malpractice liability attaches, I feel for that doctor who will have the death of a child on her conscience fo.r the rest of her life.
Doctors’ jobs are hard enough when the State does not enact laws that force them to think twice about asking questions and providing information that may save lives. Given how vague this Act is, thinking twice will not be nearly enough for doctors to figure out what to do to protect their patients, on the one hand, and to comply with the Act, on the other.
VI.
The Act silences a great deal of speech by one group of speakers on one topic. Precedent therefore directs us to subject the Act to at least intermediate scrutiny, under which it fails.
This law is not designed to prevent irrelevant speech from harming the doctor-patient relationship, because it allows irrelevant speech within that relationship to continue much as it did before. Far from stopping irrelevant speech in a doctor’s office, the Act instead allows virtually all irrelevant speech to continue while stopping virtually all speech — relevant and irrelevant alike — about a single topic: firearms. This law is not designed to improve healthcare because, as far as the medical community is concerned, this law will make healthcare worse. This law is not designed to protect privacy because privacy of the information at issue is already secured. This law is not designed to protect Second Amendment rights because doctors have no authority — and have not used their private positions of power — to compel firearm owners to relinqúish their weapons. This law is instead designed to stop a perceived political agenda, and it is difficult to conceive of any law designed for that purpose that could withstand First Amendment scrutiny.
Even if — perhaps particularly if — doctors were actually waging a political campaign rather than merely being perceived as doing so, the First Amendment would protect them from laws like the Act. What is more troubling is that there is no evidence that doctors are actually pursuing a political agenda with patients. Doctors are not prohibiting patients from exercising the right to bear arms; they are, perhaps, convincing patients not to do so — or to do so more safely. This is precisely the type of speech the First Amendment is designed to protect. Because the Act pro- *934 Mbits doctors from even asking the first question in this conversation, the Act is unconstitutional. Accordingly, the district court’s decision should be affirmed, and I therefore respectfully dissent.

. See Christine S. Moyer, "Public Health Approach: Physicians Aim to Prevent Gun Violence,” American Medical News, Sept. 10, 2012, available at http://www.amednews.com. American Medical News is published by the AMA. Moyer’s article describes efforts in the medical community to reduce firearm related injuries by using preventive care methods that have been used to address other public health problems such as motor vehicle accidents, smoking, and the spread of diseases.

. At its annual meeting in August of 2012, the American Bar Association (ABA) adopted Resolution 111,
opposing] governmental actions and policies that limit the rights of physicians and other health care providers to inquire of their patients whether they possess guns and how they are secured in the home or to counsel their patients about the dangers of guns in the home and safe practices to avoid those dangers.
Citing the AMA policy quoted above, the ABA specifically recognized that
[preventive care through safety counseling is a pillar of modern medicine, and is vitally important to the health and welfare of patients. It is also the ethical and legal responsibility of physicians. Failure to fulfill these duties results in a breach of the objective standard of care owed to patients.... Firearms in the home are another known risk factor that doctors may choose to discuss with their patients or the parents of young patients.

.Here is one of the State’s contradictions. Elsewhere in its briefing, the State asserts that the inquiry provision is not, as it.just stated, a proscription but is instead merely advisory. From a doctor’s perspective, however, the Act must be treated as mandatory. Indeed, the Executive Director of the body responsible for enforcing the Act, the Board of Medicine of the Florida Department of Health (Board), mailed a letter to physicians stating that the inquiry provision was mandatory. But in a change of course, the Board posted to its website shortly after Appellees filed suit that, in fact, the provision was only advisory.' The State's argument that the provision is only advisory is not a bad one, because unlike other provisions which use the clearly mandatory word "shall,” the inquiiy provision uses the ambiguous word “should.” But it would be extremely risky for doctors to rely on this interpretation, given that the timing of the Board’s change in course suggests that it may only have been part of the State’s litigation strategy. There are no assurances that, once this litigation ends, the Board will not revert back to its broader interpretation. Further, the State interprets the same word ("should”) to be mandatory in the context of interpreting the harassment provision— though the State vacillates on this interpretation, as well.

. And how will physicians be able to make the relevance determination without inquiring? I will return to this issue in the coming discussion.

. It appears that the Act determines as a matter of State law that firearm ownership is not medically relevant in all cases for preventive medicine purposes. Elsewhere in its briefing, however, the State emphasized that the Act specifically allows doctors to ask about firearms whenever they believe "in *905 good faith” that the information is relevant and to record such information unless they "know” it to be irrelevant. From this, the State concludes that "the Legislature enabled physicians to make these inquiries of any or all patients " if the doctor holds a different view of medical relevance than the State. This interpretation, of course, would allow the inquiries detailed in the legislative history; precisely the same inquiries the State previously stated that the Act was designed to prevent. Given this uncertainty, doctors who wish to ask about firearm ownership in all cases would be taking a significant risk if they continued to do so.
A bit more is said on this point in Part IV, infra, in relation to my brief discussion on vagueness.

. Given the overall purpose of the Act and the Act's legislative history — considered in light of the State’s assertions that that legislative history is illustrative of what constitutes "discrimination” — we must view the harassment and discrimination provisions as designed to reinforce the inquiry and record keeping provisions. Moreover, the fact that the Act explicitly allows the primary form of discrimination that actually occurred — that is, doctors turning away patients who refused to answer questions about firearms — belies the notion that the discrimination provision is meant to address actual discrimination experienced by firearm owners. It may indeed prohibit some of the discriminatory conduct that the State' speculates might occur, and it would not create a constitutional problem if that is all it did. In this context, however, it is difficult to see the discrimination provision as anything other than reinforcement of the other provisions prohibiting doctors from saying and writing certain things.

. In its initial brief, the State asserted (most, though not all of the time) that the word "should” in the inquiry provision rendered the provision purely advisory. Regarding the harassment provision, which included the exact same word, “should,” the State asserted that the provision “prohibits] facilities and practitioners from ... unnecessarily harassing patients who own guns.” The same word used in the same statute rendered one provision advisory but the other mandatory. In an effort to correct this contradiction, the State asserted in its Reply Brief that "the Legislature provided physicians with the freedom to ... unnecessarily harass patients about firearms, while ... suggesting that they not broach these areas.” If the State cannot even decide from one brief to the next whether the Act prohibits or merely advises against unnecessarily harassing patients, doctors certainly cannot rely on the State’s self-contradictory assurances that they will not seek to punish doctors under the harassment provision for speaking in ways that some constituents deem to be political. As Judge Tjoflat recognized at oral argument, these rules will simply cause doctors to “steer clear.”

. The Majority defines "to harass" as "[t]o disturb or irritate persistently.” Maj. Op. at 882. Many firearm owners — as evidenced by the legislative history — are irritated by virtually all discussions with their doctors about firearms. Thus, doctors "harass” their patients by persistently discussing firearms.

. Snyder also explains that "whether speech is of public or private concern requires us to examine the content, form, and context of that speech.” 131 'S.Ct. at 1216 (internal quotation marks omitted). The content of the speech prohibited by the Act certainly concerns the public, as the speech prohibited by this Act has been recognized by the AMA to be part of an effort to address a public health problem. The form and context perhaps cut in the opposite direction, but not necessarily. When a doctor speaks in private to her patients about a topic like firearm safety during the course of an examination, the message may have a fairly significant impact on the patients’ views about guns because doctors are trusted, knowledgeable, and presumably genuinely interested in the health consequences of firearms rather than the political consequences of them. To many listeners, even those well-attuned to Second Amendment political debates, a doctor’s advice could offer a new, perhaps previously unconsidered perspective that may well change public views as well as personal practices. The State was no doubt aware of the great influence doctors' knowledge and information sharing might have on the public firearm debate, and because the State disagreed with the doctors’ powerful message, it silenced them.
On topics concerning public health, doctors’ ability to inform their patients one-on-one about the consequences of legislation seems even more clearly to be a matter of public concern, even though the speech is conveyed in private.

. There is one exception from the Ninth Circuit, which is readily distinguishable from the instant case, as will be discussed below.

. Contrary to the Majority’s assertion, the R.A.V. principle — that content discrimination is permissible where the basis for that discrimination is a reason the speech receives lesser protection "should ... extend ... beyond wholly proscribable categories of speech to those categories which ... have traditionally been deemed to merit a diminished level of First Amendment protection, such as ... professional speech” — is inapposite. See Maj. Op. at 894 n. 19. That principle contemplates, for example, banning only obscenity excessive in its prurience or price advertising exclusively in an industry especially prone to fraud; prurience and fraud are bases for withholding full First Amendment protection from obscenity and commercial speech, respectively. See R.A.V., 505 U.S. at 388-89, 112 S.Ct. at 2545-46. On the other hand, a state could not ban obscenity or commercial speech only if it contained a particular political message. See id.
The Act clearly relates more closely to the political speech ban. Besides the obvious— that it restricts speech on a topic that is, at least currently, substantially politically *912 charged — the State's purported interests do not relate to any reasons for limiting First Amendment protection applicable to professional speech. First, nothing about the State’s authority to regulate professions has anything to do with protecting Second Amendment rights, as physicians are in no better position to violate those rights than any other citizen, a point I discuss more robustly herein. Second, while privacy may well be an interest that supports a potential limitation on protection afforded to professional speech, that would warrant a restriction that applies to a wide range of matters about which doctors currently may freely inquire, not one that applies to firearm ownership only. Finally, there is no evidence that firearm owners have encountered barriers to the receipt of healthcare, discrimination, or harassment, another point I will address; in other words, a restriction on content related to guns is unrelated to the State’s regulation of the profession because there is nothing to suggest that it furthers that interest.

. Even if speech may fairly be characterized as conduct, a regulation which targets conduct that consists almost entirely of speech is not immune from First Amendment scrutiny. To be sure, “it has never been deemed an abridgment of freedom of speech or press to make a course of conduct illegal merely because the conduct was in part initiated, evidenced, or carried out by means of language. ...” Lowe, 472 U.S. at 228, 105 S.Ct. at 2582 (White, J., concurring) (emphasis added) (internal quotation marks omitted). If conduct is primarily carried out by language, however, it becomes difficult to claim that a regulation of that conduct creates merely an incidental burden on speech. The speech then seems to fall under the rubric of commercial speech, subject to intermediate scrutiny. See, e.g., Sorrell, 131 S.Ct. at 2667-68.

. Indeed, considering exactly what the inquiry provision purports to do shows how far removed the Act is from the scenario contemplated in Lowe. The inquiry provision prohib *913 its doctors from asking irrelevant questions about firearms. For example, if a doctor and his patient have gotten to know each other over the years, the doctor may ask the patient whether he owns a firearm in order to see if the patient might like to go hunting. That inquiry is plainly irrelevant to the patient’s care, so it is an obvious example of what the inquiry provision prohibits. Lowe directly states that such inquiries are speech, not professional conduct: “Where ... a speaker does not purport to be exercising judgment on behalf of any particular individual,” as would obviously be the case when a doctor is asking his patient if he owns a firearm because he wants to arrange a hunting trip, "government regulation ceases to function as legitimate regulation of professional practice with only incidental impact on speech; it becomes regulation of speaking or publishing as such, subject to the First Amendment ]." 472 U.S. at 232, 105 S.Ct. at 2584. Thus, Lowe directly states that the inquiries prohibited by the Act are not legitimate regulations of professional conduct but are instead direct regulations of speech.

. Justice O’Connor’s opinion constituted the judgment of the Court as to Parts I, II, III, VA, V-C, and VI only. The First Amendment discussion falls in Part V-B, and Justice O’Connor was joined only by Justices Kennedy and Souter in this Part.

. The significance of compelling speech as opposed to restricting it can be observed in Casey itself. It is difficult to imagine that a statute prohibiting a doctor from providing truthful, non-misleading information concerning the risks of abortion and abortion alternatives would survive a First Amendment challenge.

. The Ninth Circuit's decision not to take the case en banc drew a spirited dissent, which stated that “[b]y labeling ... speech as 'conduct,' the panel's opinion has entirely exempted such regulation from the First Amendment. In so doing, the panel ... insulates from First Amendment scrutiny California’s prohibition' — in the guise of a professional regulation — of politically unpopular expression.” 740 F.3d at 1215 (O’Scannlain, J., dissenting from the denial of rehearing en banc). I share the concern that the difference between the intermediate category (speech within the professional relationship that is related to medical conduct but is not itself conduct) and the unprotected category (conduct within the professional relationship that is carried out through speech) may prove to be illusory. If the court in Pickup erred, it did so by putting too much speech into the unprotected category. Cf. Humanitarian Law Project, 561 U.S. at 28, 130 S.Ct. at 2724 (applying First Amendment scrutiny where "conduct triggering coverage under the statute consists of communicating a message”).

. Given that the State is only speculating that irrelevant notations in patients' medical files will cause them to receive worse care from subsequent doctors, it seems equally if *925 not more plausible to think that subsequent doctors would provide worse care based on a documented history of a patient's recalcitrance, tardiness, failure to pay bills on time, or frequent follow-up calls. Yet doctors remain free to make these — and any other- — • medically irrelevant notations in patients’ records, even though the consequences would seem to be just as severe as the concerns the Act purportedly addresses. When a statute is so under-inclusive, it belies the fact that the statute has another purpose. As the Court explained in Sorrell, “[pjerhaps the State could have addressed ... confidentiality through a more coherent policy.... A statute of that type would present quite a different case than the one presented here. But the State did not enact a statute with that purpose or design.” 131 S.Ct. at 2668. Instead, the State enacted a viewpoint-based restriction on speech just like the one invalidated in Sorrell with at most incidental privacy benefits. See id. at 2669 ("To obtain the limited privacy [provided for] by [the Act, patients] are forced to acquiesce in the State's goal of burdening disfavored speech by disfavored speakers.”).

. In the absence of signs, symptoms, • or complaints of an illness or condition, it is difficult to imagine how a physician would reach the conclusion that a particular question or questions would be "relevant to the patient's medical care or safety, or the safety of others.” And in some cases, it is vital to the health of patients generally that physicians inquire regarding certain matters without any particularized relevance determination, so that conditions and warning signs can be caught before developing into more serious, life-threatening matters. For example, as a matter of course, a doctor may ask a patient about his diet and exercise habits in order to assess the patient's risk of heart disease, without any indication that the patient is suffering from heart disease. If a doctor waits until a patient's poor heart health makes itself known — for example, when the patient suffers a heart attack — it may be too late.

. Again, the Majority defines "to harass” as "[t]o disturb or irritate persistently.” I am certain that most smokers are "harassed” by their doctors about smoking under this definition. If doctors apply the same persistence to firearm safety recommendations — including removing firearms from homes with children — -as they do to smoking cessation recommendations, they are, according to the Majority, harassing their patients and therefore subject to discipline. One would think that doctors ought to persist in encouraging their patients to do what the doctors genuinely believe is best for their patients' health and well-being.

. In a case confronting a somewhat similar issue, then Circuit Judge Alito used the term "discriminatory harassment” to describe federal prohibitions. Saxe v. State Coll. Area Sch. Dist., 240 F.3d 200, 204 (3d Cir.2001). Even if the harassment provision is invalidated, then, it seems that the same speech which constitutes harassment might constitute "discriminatory harassment” and thus be proscribed by the discrimination provision. Further, as noted supra in Part I, the legislative *929 history cited by the State was said to contain examples of "actual discrimination” faced by firearm owners. Those examples almost exclusively involved speech.

. There is no evidence in the record one way or the other on this point, but I suspect that doctors would turn patients away for refusing to answer questions on any topic. Indeed, if doctors continued to treat patients who refused to answer questions, doctors would séemingly be exposed to significant malpractice liability as a result.

. Normally, a doctor would be able to make the determination simply by asking a patient whether he owns a firearm. Thanks to the inquiry provision, that is no longer an option.